# IN SPECIAL TERM, 1873.

GEORGE BRUCE *v.* MARGARET M. BAKER ET AL.

WILL—*interpretation of*—
DESCENT—*laws of*—
KINDRED—*degrees of, how computed.*

Where two provisions in a will are inconsistent with each other, and can-
not stand together, the rule that the latter provision must prevail, is
only to be applied where there is an invincible repugnancy, and it is
impossible to determine which clause the testator intended to prevail.

In arriving at the intention of the testator, the entire will is to be examined,
and if necessary, words and sentences may be transposed, or even sup-
plied, to make it read as evidently intended, and as near as can be, effect
given to the whole instrument.

A general disposition, by will, of an estate, will be regarded as subject to a
more specific disposition, and it is not important in applying this rule,
whether the general, or more specific provision comes first in order.

A will should not be construed so as to disinherit an heir, unless the
intent to do so is clearly expressed.

The Statute of this State regulating descents and the apportionment of
estates, covers the entire law of descent, and the common law canons of
descent are not in force.

Where an intestate leaves him surviving, no widow, no child or children,
or descendant of such child or children, no father or mother, no brother
or sister, and no descendant of any brother or sister, no grandfather or
grandmother, no uncle or aunt in the paternal line, or descendant of
any such uncle or aunt, the estate will go to the next of kin.

In ascertaining who are next of kin in such case, we are not limited in the
line of lineal ascent to that of grandfather and grandmother, but the
estate must go to the next of kin, though such kin is found in the line
of lineal ascent further removed in degree of kindred than grandfather
or grandmother.

It is not contemplated by the Statute of descents and the apportionment of
estates that two different rules should be followed in computing degrees
of kindred, one to be applied in cases of descent of real estate, and the
other in the distribution of personal estate.

Bruce *v.* Baker *et al.*

Degrees of kindred under the Statute of descents and apportionment of estates, are to be computed by the rule of the civil law.

The great-grandmother of an intestate, by the rule of the civil law, is one degree nearer of kin to the intestate, than a great-uncle or great-aunt.

The principle of representation as given in the second section of the Statute of descents, is not applicable to that part of the fifth section of the Statute which provides that in the absence of any of the kindred named in that, and the preceding sections, the estate "shall go to the next of kin in equal degree of consanguinity." By this latter provision the estate goes to the next of kin who are living at the death of the intestate.

*Baker, Hord & Hendricks,* for plaintiff.

*R. B. & J. S. Duncan,* for Margaret M. Baker.

*Ritter, Walker & Ritter,* and *Chapman, Hammond & Hawes,* for other defendants.

BLAIR, J.—The plaintiff in his complaint, claims to be the owner in fee simple of the undivided seven-eighths, and admits that the defendant, Margaret M. Baker, is the owner of the undivided one-eighth of certain tracts of land in Marion county. For more particular reference, one of the tracts is designated as tract No. 1, and the other as tract No. 2. William Reagan owned tract No. 1, and died testate, on the 5th day April, 1847. By his will, which is made a part of the complaint, it is claimed that the said tract passed to his widow, Nancy Reagan, during her natural life, remainder to his daughter, Rachel Johnson, then the wife of Jeremiah Johnson, during her natural life, and after her death to her child or children of her body, lawfully begotten, who might survive her, in fee simple. The will, which was duly probated, reads as follows :

" I, William Reagan, of Marion county and State of Indiana, knowing the uncertainty of life, but being of sound mind and discretion, do make and publish this, my last will and testament, hereby revoking all former by me made. I do bequeath unto my daughter, Rachel Johnson, wife of Jeremiah Johnson, a tract of land on which she now lives,

lying and being in Marion county, known as the south half of the south-east quarter of section number twenty-five in township number sixteen north of range three east, for and during her natural life, provided she shall be living at the time of my death, and after her death to the child or children of her body lawfully begotten who may survive her, in fee simple. But if she, said Rachel, should die before me and leave such child or children living at my death, then, in that event, I bequeath said land to said child or children in fee simple. But should she, said Rachel, be living at the time of my death and afterwards die leaving no such child or children, then I give and bequeath said tract of land to said Rachel for life. Remainder to my right heirs in fee simple.

I give and bequeath to my daughter, Dovey Bruce, wife of George Bruce, the north half of the aforesaid tract of land for and during her natural life, provided she shall be living at the time of my death, and after her death to the child or children of her body lawfully begotten who may survive her in fee simple. But if the said Dovey should die before me and leave such a child or children living at my death, then, and in that event, I bequeath said tract of land to said child or children in fee simple. But should the said Dovey be living at the time of my death and afterwards die, leaving no such child or children, then I give and bequeath said tract of land to said Dovey for life. Remainder to my right heirs in fee simple.

It being my express intention that my said daughters shall respectively enjoy said tracts of land above described and bequeathed during their respective natural lives, and after their and each of their deaths to descend in fee simple respectively to the child or children of their bodies lawfully begotten that may survive them respectively and survive myself, and in default then to go to my right heirs in fee simple.

I give and bequeath to my beloved wife Nancy during her natural life, the farm on which I now live, known as the

south-east quarter of section number twenty-five in township number *sixteen* (16) north of range three east, and after her death to my right heirs in fee simple, except the said Rachel Johnson and Dovey Bruce, and their descendants.

I also direct that all my just debts, expenses of my last sickness, and funeral expenses, shall be paid out of the money and personal property I may die possessed of, and the rest and residue thereof I give and bequeath to my said wife Nancy, and after her death to my said daughter, Dovey Bruce.

In witness whereof, I have hereunto set my hand and seal this 11th day of November, 1842.

[L. S.]　　　　　　　　　. WILLIAM REAGAN.

Signed, sealed, and published in presence of us who have signed as witnesses in presence of each other. Phillip Sweetzer, John W. Hamilton, John Sutherland, George W. Stipp."

The complaint then shows that at the death of William Reagan, he left him surviving, 'his wife Nancy Reagan and his two daughters Rachel Johnson, then the wife of Jeremiah Johnson, and Dovey Bruce, then and still the wife of the plaintiff, George Bruce, and leaving no other child, or descendant of any other child surviving him. That Dovey Bruce had, at the making of the will, and at the death of said testator, two sons living, and that Rachel Johnson had one son, Harris L. Johnson, then living. That Rachel Johnson died on the 24th day of April, 1847, leaving her husband, Jeremiah Johnson, and her son Harrison L. Johnson, her surviving. That at the death of the said Rachel Johnson, the fee simple in and to tract No. 1, vested in Harrison L. Johnson, subject to the life estate of Nancy Reagan.

As to tract No. 2, it is alleged to have been purchased of the government of the United States, by Jeremiah Johnson in 1821, and afterwards conveyed to his son, Harrison L.

Johnson, for a valuable consideration. That Harrison L. Johnson, married Margaret Peck, by whom he had one child, John W. Johnson. That Harrison L. Johnson died intestate, on the 15th day of September, 1856, leaving his widow, Margaret Peck Johnson, and his son John W. Johnson, surviving him, each of whom received by descent an undivided one-half of both of said tracts.

"That Jeremiah Johnson, (grandfather of John W. Johnson,) died on the 5th day of April, 1857. That Margaret Peck Johnson, widow of said Harrison L. Johnson, died on the 5th day of December, 1857, leaving her son, John W. Johnson, her sole heir. That the said John W. Johnson, being thus the owner of one-half of both tracts of land by descent from his father; and the other half by direct descent from his mother, died intestate on the 27th day of December, 1872, leaving surviving him no widow, no child or children, no father, no mother, no brother or sister, and no descendant or descendants of any such brother or sister, no grandfather or grandmother, no uncle or aunt in the paternal line, and no descendant or descendants of any such uncle or aunt in said paternal line, but leaving him surviving his great-grandmother, the said Nancy Reagan, who was the grandmother of his father," she being his *next of kin among his paternal kindred*, and to whom it is alleged the undivided one-half of the two tracts of land descended or rather ascended, and that she has since conveyed the same to the plaintiff. The other half of said two tracts, it is admitted in the complaint, passed to the maternal kindred of John W. Johnson, all of whom have conveyed to the plaintiff except the defendant, Margaret M. Baker, who owns one-eighth as before stated.

The complaint alleges that the defendants, other than Margaret M. Baker, claim some interest in the real estate, and the plaintiff asks that his title may be quieted ; and a second paragraph asks that partition be made, etc.

The defendants, Rouel Reagan and others, one of whom is a brother of William Reagan, and others who are descendants of other brothers and sisters of William Reagan, by their answer claim an interest in tract number one, by virtue of the will of William Reagan.

A demurrer having been filed to their answer, the following opinion was rendered thereon :

It is not disputed but that by the first clause of the will; if it is to stand and be construed as it reads, the tract in question would pass as follows :    To Rachel Johnson, daughter of the testator, for her natural life, and after her death to her son, Harrison L. Johnson, in fee simple.

The claim of these defendants is based upon the last clause of the will, they claiming to be right heirs of William Reagan, the testator.    This clause, as far as it relates to the claim of the defendants, Reagan and others, is as follows : " I give and bequeath to my beloved wife, Nancy, during her natural life (here tract No. 1 is described), and after her decease to my right heirs in fee simple, except the said Rachel Johnson and Dovey Bruce and their descendants.

Taking each of these provisions of the will we have :

1st.    The same real estate bequeathed to Rachel Johnson for life and Nancy Reagan for life ;

2d.    That after the death of Rachel Johnson it is bequeathed in fee simple to her son, Harrison L. Johnson ;

3d.    After the death of Nancy Reagan it is bequeathed in fee simple to the right heirs of William Reagan, the testator, " except the said Rachel Johnson and Dovey Bruce, and their descendants.

. As to the two co-existent life estates which are carved out of the fee, we have but little difficulty.    One of the first rules for disposing of such cases, is, that both take jointly, or as tenants in common—but whether we dispose of the apparent difficulty in that way, or by holding the latter life

estate to prevail over the first, is unimportant in this case. Whatever estate Rachel Johnson took, ended at her death, which occurred only nineteen days after that of her father. The disposition made of the fee presents greater difficulty. The entire scope and scheme of the will, except the latter clause, contemplates and shows, an intention on the part of the testator, to devise the estate in fee to the child or children of Rachel Johnson, if any such survived her, and only in case such child should not survive her, was it to go to his heirs.

The first part of the will, is clear and explicit; and makes a specific disposition of the fee simple of the real estate to parties competent to take, and to such as we would naturally infer he wished to give it—that is; to his daughter for life, and to his grand son in fee. In addition to this, he says such is his express intention.

It is urged that the two provisions can not stand together, and hence the latter must prevail. This is a rule which is generally announced, and yet seldom applied, and less frequently now than formerly.

There is but little reason to support it. The last solemn act in making a will, is signing and publishing it, and this act relates to all and every part of the instrument, and gives force and validity to the instrument as a whole.

The rule, at best, is but an arbitrary one, and only to be used where there is an invincible repugnancy, and it is impossible to determine which clause the testator did intend to have prevail. In arriving at the intention, the entire instrument is to be examined, sentences and whole clauses transposed, if necessary, and even words and sentences supplied, to make it read as evidently intended. As near as can be, effect must be given to the whole instrument.

A search among precedents will aid us but little.

As before stated, the will under consideration in its first

provisions is clear and specific. The person, or persons, who take in fee, certain definite parts of the real estate, are pointed out as the "child or children" of his daughters, lawfully begotten. The last clause, if the construction claimed by the defendants is to prevail, is a general bequest of the fee to his "right heirs," except to his daughters and their descendants. This construction would violate one fundamental rule, that a general disposition of the estate, will be regarded as made subject to the more specific. It is not important in applying this rule, whether the general, or more specific provision, comes first in order.

The construction claimed on behalf of the defendants, abrogates the entire will, except the last clause, and disinherits his own children; thus violating another rule, that wills should not be so construed as to disinherit an heir, unless the intent to do so is clearly expressed.

Immediately preceding the last clause, the testator says, it is his express intention, that all of his real estate, shall go to the child or children of his daughters, and only in default thereof, should go to his right heirs.

To give the will any other construction, than that which is consistent with the testator's declared intention, would make the last clause repugnant to the specific directions, as well as to the general scheme of the will, and compel us to believe that the testator had a capricious and irrational intention. If it was necessary, I should have no hesitancy in holding, that some words are omitted from the last clause, which it is clear were intended to have been used, to make it express the intention of the testator.

But even as it is, I am of opinion, that it is not susceptible of the construction claimed by the defendants.

The demurrer must, therefore, be sustained.

The defendants, Mary Cloud and others, having also filed their answer, and the plaintiff having demurred to the same,

upon the question thus raised, the following opinion was rendered :

The defendaants, Mary Cloud, Milton Johnson and Nancy Harding, living sisters and brother of Jeremiah Johnson, the grandfather of John W. Johnson, and the other defendants who are descendants of other brothers and sisters of Jeremiah Johnson, claim to have inherited a portion of the real estate.

Their claim is based upon three positions.

1st. That our statute does not permit lineal ascent above that of grandfather and grandmother, or the survivor of them, and as the first canon of the common law did not permit lineal ascent in any case, and the common law canons of descent being in force except as changed or repealed, by our statute, the one-half of the real estate descended to the collateral relatives of the blood of the father of John W. Johnson ; they being next of kin in equal degree of consanguinity.

The position is untenable. Our statute was intended to, and does cover the entire law of descents ; and in the language of the court in *Murphy* v. *Johnson*, 35 *Ind.*, 442, " the common law canons of descent have been overturned in this State by our statute of descents."

Such has been the ruling in most, if not all, of the States of the United States, where statutes of descent have been adopted similar to ours. *Penn* v. *Cox*, (10 *Ohio Rep.*, 32.)

The rights of the defendants must therefore stand, or fall, by the construction to be placed upon our statute of descents.

The first section of the statute (1 G. & H. p. 291,) provides for descent to children.

The second section, to grand children, and as it will hereafter be referred to more particularly, I cite it in full.

" SEC. 2. If any children of such intestate shall have died intestate, leaving a child or children, such child or children shall inherit the share which would have descended to the

father or mother, and grand children, and more remote descendants, and all other relatives of the intestate, whether lineal or collateral, shall inherit by the same rule :  *Provided,* That if the intestate shall have left at his death grandchildren only alive, they shall inherit equally."

The third section provides that in the absence of children or their descendants, the estate shall go to the father and mother, and to brothers and sisters, *and their descendants.*

The fourth section, in the absence of brothers and sisters or their descendants, gives all the estate to the father and mother.

The defendants are not within any of these clauses.

The fifth section, as far as applicable to this case, reads as follows :

" SEC. 5.    If there be no person entitled to take the inheritance according to the preceding rules, it shall descend in the following order :    *First.* If the inheritance came to the intestate by gift, devise, or descent, from the paternal line, it shall go to the paternal grand-grandfather and grandmother, as joint tenants, and to the survivor of them ; if neither of them be living, it shall go to the uncles and aunts in the paternal line, and their descendants, if any of them be dead, and if no such relatives be living, it shall go to the next of kin in equal degree of consanguinity, among the paternal kindred ; and if there be none of the paternal kindred entitled to take the inheritance as above prescribed, it shall go to the maternal kindred in the same order."

There being no grandfather or grandmother ; no uncles or aunts of the intestate, or the descendants of any such, the real estate in question must " go to the next of kin in equal degree of consanguinity," and in ascertaining who are next of kin, we are not limited as claimed by the defendants, in the line of lineal ascent, to that of grandfather and grandmother, but if the *nearest of kin,* is found in the line of

ascent, further removed in degree of kindred than grandfather or grandmother, it is there, the estate must go.

The statute is silent as to the rule, by which degrees of kindred are to be determined.

This leads to the second and most important question presented. The plaintiff's title is based upon the descent of the real estate to Nancy Reagan, the great-grandmother of the intestate, as his next of kin. By either rule of computing degrees of consanguinity; by the rule of the civilians, as well as by the rule of the canonists, she stands in the third degree. The defendants, who are brothers and sisters of Jeremiah Johnson, the grandfather of the intestate, (being great-uncles and great-aunts of the intestate,) by the rule of the civilians, would be in the fourth degree; and by the rule of the canonists, in the third degree, that is, in the same degree of kindred to the intestate, as Nancy Reagan.

In reckoning degrees of consanguinity, the common law recognizes two methods, the rules of the canon law being applied to the law of the descent of real estate, and the rule of the civilians being followed in the descent of personal estate, and each of which rules, it is said by common law writers, has been adopted by the common law.

A search for the origin of these rules leaves us in a maze of uncertainty, except in this; that the English statute of descents, and the rules of computing degrees of kindred according to the canonists, is the growth of the feudal system, and the encroachments of the ecclesiastical power upon the civil.

The rules are never spoken of by the text writers, or in any of the early reports, as originally a part of the common law, but as rules adopted into the common law; that is, borrowed from the canonists in the one case, and the civilians in the other. Blackstone uses this language:

"That this *nearness* or propinquity of degree, shall be reck-

·oned according to the computation of the civilians; and not of the canonists, which the law of England adopts in the descent of real estates ; because, in the civil computation, the intestate himself is the *terminus, a quo* the several degrees are numbered; and not the common ancestor, according to the rules of the canonists." *Blackstone's Com.*, 2 *vol.*, 504.

If this is the true reason of the rule, the reason fails with us, for as before stated, our statute does not search back for the common ancestor. 35 *Ind., supra.*

In a note appended by Mr. Christian to the same volume of Blackstone, page 207, note 6, he says, in reference to the descent of real estate : " It is said that the canon law computation has been adopted by the law of England ; yet I do not know of a single instance in which we have occasion to refer to it. But the civil law computation is of great importance in ascertaining who are entitled to the administration, and to the distributive shares of intestate personal property." He was perhaps mistaken in the assertion, which would carry the impression that seldom, if ever, was it necessary to refer to the rule of the canonists, in reference to real estate, but the main idea is correct as to the relative importance given by the common law to the two rules. The common law canons of descent not recognizing lineal ascent, but looking mainly to the immediate descendants of the person deceased, the difference between the two rules of computation was not often a matter of serious question. The rules of the cannon law as adopted into the English law of descents, as before stated, were the growth of the peculiar institutions of that country, and were in a great measure, if not entirely, local to that kingdom, and in nearly all the States of the United States, the system has been overturned as unsuited to our institutions and people.

To trace the rule of the civilians as adopted into the com-

mon law of England, in reference to the distribution of personal estate, would take móre time and space than I have at command.

In the first place, the king, under the prerogative of the crown, seized the personal estate, and disposed of it through his officers very much at his pleasure. Afterwards, the right was granted to "many lords of manors." Afterwards, the church was invested with this branch of the prerogative, under the assumption that, "none could be found more fit to have such care and charge of the transitory goods of the deceased, than the ordinary, who all his life had the care and charge of his soul." *Grysbrook* v. *Fox, Plowd,* 277.

This proved a delusion, however, for it was soon found that the church was appropriating the funds, except what the *conscience of the ordinary* would permit him to give to the wife and children of the intestate. Even the debts of the deceased were left unpaid. This, of course, led to trouble, and the liberty taken with the goods of deceased persons, was a matter of scandal to the church, and great oppression to the people, and was much complained of during the reign of Edward III, and in the sixteenth year of that king (in the year 1342) it was ordained, that debts should be paid, and the residue was to be given to pious objects, to persons of the blood of the deceased, the salvation of the souls of the dead, etc., and none to be retained by the ordinary, except something reasonable for his trouble. *Reeve's History of the English Law, vol.,* 3 *pp.* 85 and 230.

This did not remedy the evil. The conscience of the ordinary was still trusted, and relations and creditors still suffered. The subject was still a theme of contention, between the ecclesiastical power and the courts of common law. During all the succeeding reigns, particularly that of Henry V, Henry VIII, Elizabeth, and James 1, it was the subject of various acts of parliament, and finally in

the twenty-second and twenty-third years of Charles II, the statute of distribution was passed. Stat. at large, 1661 to 88, p. 347.

Nothing is said in that statute as to how the degrees of kindred shall be reckoned. As it was drawn by a civilian, and was conceived to have been copied from the 118th Novel of Justinian, it was always construed according to the rules of the civil law, and the rules of the civil law in computing degrees of kindred were always followed. The occasion of making this statute of distributions, was to end the long contest between the common law and the ecclesiastical courts. *Wallis* v. *Hodson,* 2 *Atkyns,* 115; *Edwards* v. *Freeman,* 2 *P. Wms.,* 435.

An interesting case illustrating the law as it previously existed, is that of *Carter* v. *Crawley,* decided in 1681. *T. Raymond's Rep.,* 496.

It is said of this statute " that it is little more than restoration, with some refinements and regulations, of our old constitutional law; which prevailed as an established right and custom, from the time of King Canute downward, many centuries before Justinian's laws were known in the western part of Europe. 2 *Blackstone's Com.,* 516; *Broom's Com.,* *Vol.* 2, 649; *Williams on Executors,* 1060.

It was claimed, that the abuses that had crept in, were but encroachments of the canonists upon the common law.

Granting dispensations for marriage, was a power claimed by the canonists, and by their rule of computing consanguinity, a greater number of persons were brought within the prohibited degrees, and hence their power and means of acquiring revenue from dispensations was increased, and hence their adherence to the rule.

In Britton, which was written about the beginning of the thirteenth century, a figure or " Arbor Consanguinitis " is

spoken of in the chapter on degrees of kindred, as prepared by the author and inserted in the book.

In a note appended by Plowden, to the case of *Clere* v. *Brooke*, (*Plowden*, 451) a case decided in the fifteenth year of Elizabeth, and involving the descent of real estate, it is stated " Bracton and Britton also made mention that they had drawn out in their books a tree of parentage, by which it would plainly appear how the degrees of consanguinity are to be accounted; * * * * which figure or tree is not printed in either of their books, and, therefore, I have drawn it out in the line direct descending and ascending, according to the notion of Bracton, (as far as I am able to collect from his book,) which is agreeable to the civil law."

In the more recent edition of Britton by Nicholas, (vol. 2, p. 321) the tree is given, and is in accordance with the rule of the civilians.

The establishment of the feudal system, the right of primogeniture, and the yielding of the civil to the ecclesiastical power, were the growth of years. The liberty which characterized the ancient Saxons did not yield readily to such encroachments. By the ancient Saxon laws, lands descended equally to all the sons. Under William the Norman, the right of primogeniture was attempted to be established. Under Henry the First this was modified so that only the principal homestead went to the eldest son, and the rest was equally divided. It was at a still later period before the right was fully recognized, and with it, the recognition of the ecclesiastical power, and the rule of the canonists. 4 *Blacks.*, 421; *Stephen's DeLolme on the Eng. Const., vol.* 1, *pages* 13, 41, and 43.

I see no reason to doubt, therefore, that what is known as the rule of the civil law, is as well a part of the ancient common law, and I believe even older, than the rule of the canonists; which was forced upon the common law by the encroachments of the ecclesiastical power.

For the purpose of determining who is entitled to letters of administration, as the next of kin to the intestate, where the true degree of relationship was to be ascertained, the rule of the civilians has always been followed in England. 2 *Blackstone*, 208, note 6.

We have adopted the common law by statute, 1 G. & H., p. 515. Have we then in force in this State two modes of computing degrees of kindred; one to be observed in the descent of real estate, and the other in the distribution of personal estate? From 1817 to the revised code in 1843, the same statute in this State regulated the descent of both real and personal estate. *Revision of* 1824, *p.* 154; *revision of* 1831, *p.* 207; *revision of* 1838, *p.* 236.

In 1843, for some reason, the two provisions were separated, and statutes of descent and distribution were passed. *Rev. Stat.* 1843, *pages* 440 *and* 552.

In the revision of 1852, the descent of the real estate, and the distribution of personal property, are provided for in the same chapter and sections; but no rule of computing degrees of kindred is prescribed.

It is true that we might have two modes, the one relating to the descent of real estate, and the other the distribution of personal effects. But this would be inconvenient and would lead to confusion, without accomplishing any good purpose, and it is not likely that such was intended.

The leading text writers of this country have always laid down the civil law rule, as the one generally, if not universally followed in the United States. 4 *Kent's Com.*, 412; 2 *Washburn on Real Prop.*, 405; 2 *Hilliard*, 202; *Walker's Am. Law, p.* 356.

In Pennsylvania, where the common law has been adopted by statute, as in our State, and in Ohio where it has been held that the common law is in force, it is also held, that the rule of the civil law prevails in computing degrees of kin-

dred, as being more in harmony with the spirit of our institutions, and showing the true degree of relationship by blood. *McDaniel* v. *Adams*, 45 *Penn. St.*, 430; *Penn and others* v. *Cox*, 10 *Ohio*, 22; *Clayton et al.* v. *Drake et al*, 17 *O. S.* 367.

Not believing that it was ever intended or contemplated that degrees of kindred, under our statute of descent and distribution, should be computed in two different ways, but that the rule should be uniform, and believing the rule of the common law, which was adopted from the civilians, to be the better rule, as showing the true degree of relationship by blood, we hold it to be the rule that should be followed.    In the case of *Hillhouse* v. *Chester*, 3 *Day's* ( *Conn.*) *R.* 167, the Supreme Court of Connecticut held, that as real and personal estate descended by the statute of that State, in certain cases to *the next of kin*, it could not be supposed that one rule was intended to be adopted to ascertain who was *next of kin* as to the personal estate, and another as to the real estate; and that as the phrase *next of kin* was borrowed from the English statute of distributions, where it meant the nearest relation according to the rule of computation of the civil law, such meaning must attach to it when used by the statute. The rule of the canonists, as before stated, is no more a rule of the common law than is the rule of the civilians.    From the very earliest period of the English common law, from the time its rules first began to be recognized and applied, we find the rule which is spoken of as the civil rule, recognized and followed as a rule of the common law, and applied in all cases where degrees of kindred were to be computed, except in the instance of the decent of real estate.    The peculiarities of the English canons of descent, the growth, or remnants of feudalism that pervade them, the right of primogeniture, and the grasping after ecclesiastical power, led to the adoption of the rule of the canonists, and as we have cut loose from these, we should let the rule go with

them, and adhere to the one best adapted to our condition of society and institutions.

In the third and next place, the claim of the defendants Mary Cloud and others, is based upon the principle of representation, as provided for in the second section of the statute of descents. Admitting that the rule of the civil law should prevail in computing degrees of kindred, they claim that being descendants of ———— Johnson, the great-grandfather of John W. Johnson, they inherit the share which the great-grandfather would have inherited, had he been living at the time of the death of John W. Johnson; that he was of equal degree of kindred to the intestate with Nancy Reagan, and that these defendants represent him, and are entitled to take the share which he would take if he were living.

Upon this point my opinion concurs mainly with the able argument of Gov. Baker in his brief.

The first section of the statutes of descents provides for descent to children. The second section provides, that if any child of the intestate shall have died, leaving descendants alive, they shall inherit the share which should have descended to the father or mother.

Thus far the two sections are canons of descent.

The following is then added to section two : " And grand children, and more remote descendants, and all other relatives of the intestates, whether lineal or collateral, shall inherit by the same rule," etc.

This latter clause is not a canon of descent; that is, it does not prescribe who shall inherit, but merely announces a rule by which those who are mentioned in the preceding and succeeding sections shall inherit. While the principle of representation is one that has always been favored by the civil law, and is in accordance with the genius of our statute, it is not one to be applied in every conceivable case, and it is only to be used where the terms of the succeeding sections of the statute make it applicable.

In the third section it should be applied. By that section, if an intestate dies without lawful issue or their descendants alive, one-half the estate goes to the father or mother, or the survivor, if either be dead, and the other half to the brothers and sisters *and to the descendants* of such as are dead. Here may be an application of the rule to collateral relations. But for the rule, if an intestate should leave two brothers and four nephews, children of the deceased brother, him surviving, one-half of the estate would be equally divided between the six heirs, the two brothers and four nephews. With this rule, the half would be divided into three equal parts, the four nephews taking the part which would have descended to their father had he been living.

The fourth section affords another instance where the application of the rule is expressly provided for.

The latter part of the fifth section does not, in my opinion, afford any room for the application of the principle. In the absence of all persons entitled to take by the preceding sections, and of those who are named as entitled to take in the first clause of the fifth section, it is provided, that the estate " shall go to the next of kin in equal degree of consanguinity." I take this to mean, the next of kin who are living at the death of the intestate. To say that it means a class of persons whose ancestors, if living, would inherit it, seems to me would be making a new canon of descent. This we can not do by judicial construction. The demurrer to the answer of Mary Cloud and others, should, therefore be sustained.

NOTE.—This cause was disposed of by judgment at Special Term, in accordance with the foregoing rulings, and aftrewards affirmed in General Term on Judge Blair's opinion.—REPORTER.